BNP Paribas SA v. Entisar Osman Kashef et al. All right. You may proceed. Thank you, Your Honor. My name is Karen Seymour. With the law firm Sullivan and Cromwell, we represent the petitioners and the defendants below. Petitioners are asking this court to step in to correct a fundamentally flawed class certification decision that certifies the class for 23,000 individuals spread across the country of Sudan and now South Sudan to bring tort claims for various harms over a 14-year period. It's a decision that we believe attempts to reshape Rule 23's requirements, first, by ignoring the strictures the Supreme Court's holding in Dukes on the bounds of commonality, and second, by skirting the predominance requirement by certifying very generalized issues and abstract questions for class treatment. But the issue for us today is not the merits of that decision, but whether the court should review that decision now. And we think that the court should for three reasons. First, the district court's decision forces defendants to trial by hypotheticals where we're completely unable to defend about the real circumstances of each individual. And that places inordinate settlement pressure on defendants. Can I ask a question, though? It seems to me that if you were to prevail today, then you'd be litigating with the same individuals, right? And wouldn't that create the same or even more pressure? Because then you'd have the prospect of 23,000 trials. There may be settlement pressure. The point isn't whether there may be settlement pressure in a mass tort claim. We think it's less so because it's very difficult for us to defend against these abstract, general questions without the specifics of each individual. And so our position is we want our day in court to fairly defend against individual claims that are assembled inappropriately together in a class proceeding. This case may settle out eventually, but the decision on class certification, which we believe is fundamentally flawed and should be corrected, we can do so now. And if we proceed individually, we don't have that on the books, Your Honor. So what's your strongest case for allowing an interlocutory appeal? You don't seem to satisfy the death knell standard or effectively concluding the litigation. And there's a little additional language in Sumitomo that suggests maybe if there's an egregious error in the district court. But I wasn't able to find any case. And you seem to make an argument that it just would be very costly. So what's your strongest case for our exercise of allowing exercise of jurisdiction? Your Honor, we think that there are, we meet both prongs of Sumitomo plus the Hennessey. Death knell? Death knell? This is a death knell because we will not be able to appeal a final judgment until all 23,000 individuals' damages proceedings in phase two have been adjudicated. I think your opposition argues you have $3 trillion of assets last counted and that this is far from a death knell situation. It will be protracted litigation. Your Honor, there respectfully will be pressure to settle when we have a trial that decides core issues of liability on such generalized issues without specifics of an individual. Isn't that always the case? It's not always the case. Oftentimes people have exactly the same injury. Class certification and mass tort claims typically occurs. Is it more likely that you'll settle if it's a class action because you can deal with these issues rather than 23,000 times? Your Honor, we think that the settlement here is more likely when we're forced with core issues of liability for these generalized questions. We are unable to defend against an individual who may have been injured by one of the militia groups, for example, in the generalized trial. We're unable to prove up that causation. There could be someone who meets the definition of a refugee, for example, who's a derivative refugee. There could be someone who was abused by their spouse who's going to fall within this refugee asylee determination, be part of this class as defined, and we're unable to defend whether BNPP was responsible for something that even the government of Sudan didn't do. So we think that there are core questions. We think there are fundamental questions of class action law, to go back to Judge Carney's question, that are also important for review. And then there's also the third prong that for any reason. This is going to be a prolonged process if it's fully litigated to completion by any standard. And so reviewing now when something is so clearly flawed makes more sense to give guidance, to reverse this now, than to face the prospect that the parties will have to do this all over again in years from now, Your Honor. So we think we meet all of the standards. Thank you. We urge the court to grant the petition. Thank you. We'll now hear from Mr. Gilmore. Good morning, Your Honors. My name is Scott Gilmore from Hausfeld, representing the respondents and plaintiffs below. Your Honor, the petition should be denied for three reasons. First, because it's not ripe. BNPP raised its prospect of astronomical liability for the first time in its reply. It didn't even argue this would be a death knell. And it's not a plausible issue that a bank that paid an $8.9 billion fine in 2015 and still grew to be Europe's largest bank is going to succumb to any settlement pressure, particularly when there's equal settlement pressure, whether it's certified as a class or individually. Now, that presents a ripeness issue because, as we filed in our supplemental notice, Judge Hellerstein recently clarified that the court has not yet issued a final certification order and specifically reserved determination on whether class-wide damages would be available. Now, because we don't have a ruling on that yet. Well, I mean, he certified it with respect to essentially liability or common arguments with respect to liability, right? Yes, that's correct, Your Honor. So isn't that enough to be here? You're saying we have to wait until he's decided whether the shoe will drop on damages as well? Well, there are certified questions on common issues that go to liability. However, BNPP's point as to whether astronomical liability and settlement pressure, which is really the rationale for interlocutory appeal, that is mooted by the fact that the damage issue has not yet been decided. But Sumitomo also notes that interlocutory review is appropriate when it promises to spare the parties and the court the expense and burden of litigating the matter to final judgment, only to have it inevitably reversed by this court on appeal after final judgment. If we were to be convinced at this juncture that class certification was incorrect, given the nature of the claims, wouldn't it waste everyone's time and money to proceed? Your Honor, no, it would not be a waste. And part of that is because the court correctly found four predominant common issues. There's nothing abstract or hypothetical about the certified common issues in this case. There's nothing abstract that BNPP pled guilty to a conspiracy to evade the U.S. sanctions. There's nothing abstract about this government of Sudan's campaign of persecution, which, as this court took judicial notice in 2019, was recognized by Genocide. And in fact, in the hearing below, BNPP admitted that that's a common issue. There's nothing abstract either about the systemic scale of BNPP's conscious assistance of the government of Sudan. And that's really what distinguishes this case from talisman, which is BNPP's chief authority, which they claim creates an inter-circuit split. Now, it does not. The reason why is because there are two class-wide inferences on causation in this case that were absent from talisman. The first, as the Supreme Court noted and explained just last year in the Twitter v. Tamney case, when you have an accomplice that pervasively, systemically, and culpably assists an entire enterprise, entire criminal enterprise, it's liable for all the torts committed by that enterprise. And that's what happened here. Since 1997, BNPP became the de facto central bank of Sudan, and it laundered billions more than the entire military budget of Sudan. Under the Twitter v. Tamney analysis, and this is true under the operative Swiss law as well, BNPP is directly tethered to every single violation committed by the government of Sudan because they paid for them. Part of the problem is that the class as certified has common questions relating to whether the government of Sudan persecuted the class members. All 23,000 in the same way, just by virtue of being folks who left Sudan and came to the United States. Isn't that way too broad a brush? I mean, that seems like it's going to necessarily involve individual questions. Some people may have just left Sudan for totally different reasons, right? No, Your Honor. And the reason why is because under Dukes, the U.S. government has already provided the common answer to that question. Each and every class member was admitted to the United States following an executive determination that they were persecuted or feared persecution by the government of Sudan. Now, that BNPP has speculated that perhaps some people suffered domestic abuse. That is not so. There is no scintilla of evidence in the record that they have adduced that a single refugee in this class was admitted for any reason other than government persecution. Moreover, the case law is clear and was recognized by the first circuit con versus holder that you have to show a nexus to state action. You have to show a fear of persecution by the government that makes you unable to return and unable to avail yourselves of the protection of that government. Non-governmental violence could suffice to make that credible fear determination, but only if you can show that the government was condoning that violence. And that's not the case here. Just as in the Khan case where the government of Afghanistan was fighting the Taliban, that fact defeated the persecution finding because here the government of Sudan was actively fighting the rebel groups that BNPP claims were possible perpetrators. Now, that gets us specific causation as to the common injury of forced displacement. Forced displacement, which is a violation of the right to the home and family life under Swiss law, every single class member experienced that. They were all unable to return, which means they all shared that injury. Now, whether there's a difference in their damages is a question yet to be determined by the court. But regardless, as the Supreme Court made clear in Tyson's food, a difference in damages is not going to defeat predominance and it will not defeat it in this case. Thank you. Mr. Gilmour and Ms. Seymour will reserve decision.